IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY MORRISON,<br>Reg. No. 43820-112, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:16-CV-957-WHA |
| | ) | |
| WALTER WOODS, | ) | |
| | ) | |
| Respondent. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION

This case is before the court on a 28 U.S.C. § 2241 petition for writ of habeas corpus filed by Larry Morrison, a federal inmate confined in the Maxwell Federal Prison Camp at the time he filed this civil action.[1]  In this petition, Morrison presents numerous challenges to the constitutionality of actions taken against him during his participation in the Residential Drug Abuse Program ("RDAP") while at Maxwell.[2]  Specifically, Morrison

---

[1] Morrison is now enrolled in the Residential Re-Entry Management Program in Los Angeles County, California, a program operated by the Bureau of Prisons ("BOP").

[2] The Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA") directs the BOP to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b).  To carry out this requirement, the BOP must provide residential substance abuse treatment for all eligible prisoners, "subject to the availability of appropriations[.]" 18 U.S.C. § 3621 (e)(1).  An "eligible prisoner" is one who is "determined by the Bureau of Prisons to have a substance abuse problem," and who is "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B)(i) and (ii).  As an incentive for the successful completion of RDAP, the BOP may, in its discretion, reduce an eligible inmate's sentence by up to one year. 18 U.S.C. § 3621(e)(2)(B).  The BOP is afforded complete discretion in determining whether an inmate will receive a reduction in his sentence and the amount of the reduction awarded.

alleges the conduct of prison personnel violated his right to equal protection because the officials acted due to his religious beliefs and further alleges they retaliated against him for seeking relief from adverse actions of prison officials.  Doc. 1 at 7.  Morrison maintains these actions resulted in prison personnel improperly determining that he "would be doing an extra (7) Seven Months in RDAP[.]"  Doc. 1 at 12; Doc. 1 at 17 (On September 27, 2016, Chief Psychologist "Juliana Dodd informed me . . . that she was rolling me back (7) Seven months to Rational Phase which was starting in a few weeks.").   In addition, Morrison asserts that the challenged actions led him to the conclusion that "signing out [of RDAP] was my only honest alternative" as he believed continued participation in the program would require him to contradict his beliefs.  Doc. 1 at 17; Doc. 40-2 at 2 (petitioner alleging he "felt coerced into withdrawing" from RDAP).   Morrison seeks an order directing the BOP to provide him "the completion certificate for RDAP, a return of the year off that was taken from [him], and immediate or expedited placement in halfway house/home confinement; or a fair and impartial clinical team which will decide if he is worthy of [the requested relief] or not."  Doc. 1 at 17.

In his responses to the petition, the respondent denies any violation of Morrison's constitutional rights during his participation in RDAP.   The respondent argues that Morrison voluntarily withdrew from the program on September 28, 2016 by completing the appropriate form for withdrawal.  Doc. 20-4 at 48–49.  The record establishes that Morrison discussed his withdrawal from RDAP with the DAP Coordinator, Dr. Hughes, who processed Morrison's request for withdrawal.  Doc. 20-4 at 49.  Dr. Hughes noted that

"Inmate Morrison reported in writing and verball[y] that he wanted to voluntarily withdraw from the RDAP.  He is aware he will no longer be eligible for early release.  [Morrison] may apply for reconsideration for the RDAP after 90 days and/or apply for non-residential RDAP."  Doc. 20-4 at 49.  Morrison acknowledged his request for voluntary withdrawal from RDAP and his understanding of the ramifications of his withdrawal via his signature on the form.  Doc. 20-4 at 49.  The respondent asserts that at the time Morrison chose to withdraw from RDAP he had failed to demonstrate significant treatment progress after being afforded multiple opportunities for adjustment such that the Clinical Team determined "Morrison was not ready for RDAP completion and that a return to Core Phase would be most beneficial to Petitioner to help him build skills in more effectively using Rational Self-Analysis and Rational Self-Counseling."  Doc. 20-4 at 7.  Contrary to Morrison's assertion that he earned "the year off" relative to completion of RDAP, Doc. 1 at 17, it is undisputed that Morrison did not complete RDAP which rendered him ineligible "to receive the benefit of the sentence reduction incentive."  Doc. 29-1 at 4.  The respondent also argues that the petition is due to be denied because Morrison failed to fully and properly exhaust his available administrative remedies prior to seeking relief from this court.  Doc. 20 at 11–13.

In support of his exhaustion defense, the respondent maintains that

[t]he BOP's Administrative Remedies process provides inmates with opportunities for formal review of their complaints related to any aspect of their imprisonment.  [*See* 28 C.F.R. § 542.10(a)].  To initiate the formal Administrative Remedies process, however, an inmate must first file a request for administrative remedy with the institution's Warden (BP-9, level 1).  If the inmate is dissatisfied with the response at the institutional level,

the inmate may appeal the decision to the Regional Director (BP-10, level 2) and, thereafter, to the General Counsel's National Inmate Appeals Office (BP-11, level 3). 28 C.F.R. § 542.15. An inmate must appeal through all three levels of the Administrative Remedy Process to exhaust all administrative remedies. 28 C.F.R. § 542.15(a) ("Appeal to the General Counsel is the final administrative appeal.").

 . . . . The BOP provides a three-step administrative remedy program for all confinement issues, and "[a]n inmate has not fully exhausted his administrative remedies until he has appealed through all three levels." *Irwin v. Hawk*, 40 F.3d 347, 349 n.2 (11th Cir. 1994). Here, Petitioner filed his remedy requests [on claims 1, 2, 4, 5, 9 and 10] with the Warden (F1), and being dissatisfied with the Warden's responses, filed his appeals to the Regional Director (R-1) [which were denied]. Petitioner's appeals to the General Counsel's Office (A1) were rejected because they were deficient. Because Petitioner failed to correct the deficiencies and re-submit his appeals to the General Counsel's Office, he abandoned his administrative remedies [on these claims] before completing the process.

Doc. 20 at 12–13. As to grounds 3, 6, 7, 8, 11, 12 and 13, the respondent asserts these claims "are raised in the petition for the first time and are not properly before the Court since Petitioner failed to raise these grounds at the administrative remedy level beginning with the Warden." Doc. 20 at 12.

## II. RDAP

Juliana Dodd, the Chief Psychologist at Maxwell who provides oversight and guidance to the facility's treatment programs, including RDAP, addresses the purpose of RDAP and Morrison's participation in the program as follows:

Larry Morrison, federal register number 43820-112, is an inmate currently incarcerated at FPC Montgomery. Petitioner was convicted of violating 21 U.S.C. § 846 & 841(b)(1)(A), for conspiracy to possess with intent to distribute methamphetamine. He was sentenced on October 7, 2008, in the U.S. District Court for the Western District of North Carolina to 210 months of imprisonment in a federal institution to be followed by 5 years of

4

supervised release.   His current release date from BOP custody via good conduct time release is November 25, 2018.

I am familiar with inmate Larry Morrison and his allegations regarding the RDAP at the FPC Montgomery. In preparing this declaration, I have reviewed inmate Morrison's complaint, his records, and relevant BOP policies and regulations.

The purpose of the BOP's drug abuse programs is to inform inmates of the consequences of drug/alcohol abuse and addiction, and motivate inmates to apply for drug abuse treatment both while incarcerated and after release.

Only inmates who complete RDAP are eligible for consideration of up to 12 months off their sentence provided by 18 U.S.C. § 3621(e). In order to successfully complete the RDAP, an inmate must complete the three components: Unit-based component, Follow-up services, and Transitional Drug Abuse Treatment. The Unit-based component lasts for 9–12 months and requires a minimum of 500 hours. The Follow-up services component is the time between completion of the Unit-based component and transfer to a community-based program. The length of this portion is variable.     The Transitional Drug Abuse Treatment component is community based treatment that ordinarily begins upon the inmate's transition to a Residential Re-entry Center (RRC). Inmates may voluntarily withdraw from the program at any time.

All BOP RDAPs are organized in 3 unit-based treatment phases:

a.  **Phase I** - The Orientation Phase, where a thorough psychosocial assessment is done by the participant's primary treatment specialist in the interest of developing a treatment plan. Ordinarily this phase should not last longer than two months;

b.  **Phase II** - The Core Treatment Phase, where the inmate is expected to build positive relationships in group (sessions), in the treatment unit, with family/significant others, with staff, etc. Within this phase, treatment staff monitor[s] the participant's behavior, personal insights, motivation, and commitment to treatment daily to determine if the inmate's behavior in the program is consistent with his or her behavior throughout the institution. Ordinarily this phase will last no longer than five months;

c. **Phase III** - The Transition Phase, where the focus is on the inmate practice of pro-social skills acquired in treatment while developing realistic expectations for exiting the program. Participants are not to complete the program until they have mastered the expected behaviors of Phase III. Ordinarily, this phase will last no more than two months.

According to inmate Morrison's RDAP records, on November 30, 2015, he underwent a diagnostic interview for RDAP participation where he was diagnosed with cocaine use disorder-severe. On December 1, 2015, he signed an agreement to participate in the RDAP. He was enrolled in the RDAP on December 16, 2015.

Inmate Morrison's RDAP records indicate a pattern of limited progress, low commitment toward integrating and practicing prosocial values, and poor treatment compliance with expected behaviors as a member of the therapeutic community.

On January 12, 2016, during inmate Morrison's initial Clinical Team Treatment Review he reported that "when he does not get his way he internalizes his anger and thinks of ways to retaliate against others." Inmate Morrison later openly admitted that his desired way to retaliate is to file administrative remedy claims against those who oppose his wishes. In the same Clinical Contact, he reported that he understood his decision to file claims is usually "done to get back at staff members and [it] is unhealthy for him to continue engaging in such behaviors." The treatment team advocated that inmate Morison work with his mentor and associated senior RDAP inmates as well as treatment staff to help him manage his anger better so that he would not reach the impulse to retaliate.

It should be noted that the "mentor" is an inmate. So, consistent with the RDAP's Modified Therapeutic Community model, inmate Morrison was provided other recovery-focused inmates with whom to consult. This was not to "chill" him from filing administrative remedy requests, but to provide a means for him to ensure that he was not filing to "get back at staff" rather than based upon some real issue.

On March 8, 2016, inmate Morrison received his Clinical Treatment Team Review of his readiness to transition to Phase II – the Core Phase. It was noted by BOP RDAP staff that he continues to struggle

with employing healthy coping mechanisms and skills, and resorts to manipulation as his primary method of coping with events or actions he does not like. Ultimately, inmate Morrison's progress at the time was deemed acceptable for him to move forward to Phase II – Core Phase.

On April 4, 2016, inmate Morrison was "pulled up," a common treatment event that occurs during daily Community Meetings when an inmate is held accountable for unhealthy or disruptive behavior by other members (other inmates). On this date, inmate Morrison was held accountable for putting down another community peer. Inmate Morrison was held accountable because he engaged in conversation in which he used homophobic slurs against other community peers. Inmate Morrison then apologized for his actions and took ownership of his disruptive behavior.

On April 5, 2016, two relevant encounters occurred with Inmate Morrison. During the first, he met with his primary Drug Treatment Specialist (DTS) and retracted ownership of his admitted [disruptive] behavior on April 4, 2016. Inmate Morrison stated that his homophobic language was taken out of context and that he disagreed with the DAPC and the community meeting. He further stated that he wanted an apology from the DAPC. However, the DAPC noted that she did not make or use any derogatory comments toward or about Mr. Morrison to him or anyone else during this or any other discussion. The second encounter on this date occurred after inmate Morrison refused to take ownership of the unhealthy behavior, which occurred when he refused an order from staff during the Clinical Treatment Team Review to attend a Parenting seminar.

On August 22, 2016, inmate Morrison was held accountable in the daily Community Meeting by a participant (another inmate) for not being receptive to a peer's feedback. The participant (inmate) noticed inmate Morrison appeared to be out of uniform because he had a colorful piece of material in his pocket. The inmate then started a conversation about it with inmate Morrison who replied that the colorful square was a part of his religion and was approved. The other inmate suggested that inmate Morrison tell the RDAP group that the colorful material was allowed under the religious exemption. Mr. Morrison mistook this as a directive to explain his religion to the group and took offense, despite other BOP RDAP staff stating that was not the intention of the exercise. However, inmate Morrison

chose not to take ownership for his reported negative behavior of not being receptive to feedback and requested further staff intervention.

In response to inmate Morrison's request for staff intervention, the issue was examined in a Clinical Treatment Team Review meeting on August 23, 2016. It should also be noted that based upon the concerns inmate Morrison raised of religious discrimination, the DAPC suspended the meeting and sought clarification from Religious Services as to whether or not addressing [the] religious item in his pocket would be considered an offensive behavior. The Supervisory Chaplain stated that while many Santeria inmates may carry such religious items (photos), . . . the religious items (photos/icons) are considered private items typically not openly addressed with others. However, by wearing the religious item (photo) in his pocket outward, where it was visible to others, inmate Morrison was no longer keeping the item private and made it subject to discussion and consideration by others.

The DAPC also consulted with me, as Chief Psychologist, regarding how to best address recovery-focused behaviors. Together we concluded that the treatment issue of inmate Morrison demonstrating a lack of open-mindedness and unreceptivity remained, and that these were appropriate to address within the context of his addiction treatment.

On August 29, 2016, the RDAP Treatment Team recommended a treatment amendment known as a "Formal Warning", which is a notification to the inmate that he or she is demonstrating a[] significantly unhealthy pattern of behaviors. The Clinical Treatment Team further discussed inmate Morrison's unhealthy behaviors and how they were interfering with his treatment progress, assigned other treatment interventions chosen to reduce the unhealthy behaviors and improve progress, and advised inmate Morrison of the team's expectations as well as consequences for failure to alter his behavior.

The Formal Warning document noted that inmate Morrison would be reviewed by the Treatment Team again in approximately 30-days to assess his progress. Contrary to inmate Morrison's assertions in this suit, the review did not have to occur in EXACTLY 30 days. There was no set number of days as in the disciplinary process, as this is part of a treatment planning process not a disciplinary process.

8

On September 27, 2016 (28 days after the Formal Warning), inmate Morrison was seen by the Clinical Treatment Team for review of his progress in addressing the treatment goals established in his Formal Warning dated August 29, 2016. He elected to have an inmate in the Follow-Up level present as a positive peer. It was determined that Petitioner had not fulfilled the goals of his treatment amendments in that he continued to show failure to (and overt resistance toward) integrating constructive feedback provided by others. Further, he had not been following through on commitments made to others to demonstrate changes consistent with his treatment plan and addendum goals.

Based upon inmate Morrison's demonstrated insufficient change regarding treatment goals and the problem areas previously identified, the Clinical Treatment Team concluded inmate Morrison was not ready for RDAP completion and that a return to Core Phase would be most beneficial to Petitioner to help him build skills in more effectively using Rational Self-Analysis and Rational Self-Counseling. Remediation opportunities were offered and discussed as a means of helping inmate Morrison achieve the progress required to complete RDAP. Options for continuing treatment or discontinuing treatment if he desired (voluntary nature of the program) were explained. At that time, inmate Morrison expressed willingness to continue in treatment. He was advised that he would be notified of which segment of the RDAP he would need to focus on for remediation by no later than the next morning.

Inmate Morrison was not "rolled back 7 months" in the RDAP. Rather, as was explained to him by the Clinical Treatment Team, the focus of the remediation period would be for him to achieve consistent mastery of treatment concepts (e.g., effective application the Rational Self-Analysis). After completing the module that would allow him to build his mastery he (inmate Morrison) would be reevaluated by the Treatment Team and could move forward at that time from the previous treatment stage (Transition phase). Thus, he was not sent back to the beginning of the program (this is the 7 month "roll back" to which he refers). At the time of his withdrawal, the Treatment team had not determined what core phase module inmate Morrison should revisit.

On September 28, 2016, Inmate Morrison reported to his Primary Treatment Specialist that he desired to withdraw from the treatment program. He signed the "Notice of Change in RDAP and 362l(e) status" form (BP-767) and was referred to the unit team for change in unit assignment.

Inmate Morrison expressed verbally and in writing that he wished to withdraw from the program. Because he did not successfully complete the RDAP, he is no longer eligible to receive the benefit of the sentence reduction incentive.

Policy allows an inmate who has withdrawn from RDAP to apply for admission to the non-residential drug abuse program, or re-apply for admission to the RDAP after 90 days through an Inmate Request to Staff form to the DAPC. As of the date of this declaration, inmate Morrison has not attempted to re-apply for admission to the RDAP and has not applied for admission to the non-residential drug abuse program.

Policy also allows inmates to seek formal review of their complaints regarding the operation of the drug abuse treatment program by using the BOP's administrative remedy procedures.

Doc. 20-4 at 2–8 (paragraph numbering and citations to attachments omitted).

In a supplemental declaration, Ms. Dodd addresses additional arguments set forth by Morrison after submission of her first declaration as follows:

BOP policy for inmate early release under 18 U.S.C. § 362l(e) is found in Program Statement 5331.02. Part 9 of the program statement, titled "Assignment of § 3621(e) Early Release Conditional Date", provides that upon a qualified inmate's entry into the RDAP, the DAPC will, within 15 working days, forward a *Notice of § 3621(e) Date form* to the Designation and Sentence Computation Center (DSCC) team responsible for the inmate's sentence computation requesting computation of a § 3621(e) conditional release method date, with a copy to the unit team and the Correctional Systems Department (CSD).

Part 11 of program statement 5331.02, titled "Monitoring of Early Release Status", provides that an inmate may require changes to, or lose, his early release eligibility at any time as a result of information that renders the

inmate ineligible . . . (emphasis added). Paragraph a. (2) of that part 11, titled, "Additional Completion Time in RDAP", provides that if an eligible inmate is determined, for clinical reasons (e.g. difficulty meeting treatment goals) or administrative reasons to require additional time to complete the RDAP, the DAPC, or designee, will immediately forward the Notice of §3621(e) Date form to the CSD, Unit Team, and the DSCC.

The 3621(e) release date is a conditional date and is based upon the completion of all components of RDAP.

Per BOP Policy, the inmate's unit team is responsible for making referrals for Residential Reentry Center (RRC) placement. RRCs are also known as halfway houses.

Although Psychology staff [members] do not prepare the documents, I am familiar with them. The Referral for RRC Placement form, lists inmate Morrison's "Anticipated Release Date" as "11-25-2017". Next to [this date], under "Method", is the term "3621(e) COND". This means the anticipated release date is conditional; based on inmate Morrison's completion of the RDAP program. The Referral for RRC Placement form is a tool used by the unit staff for purposes of inmate release planning. A date appearing on this document is not a guarantee the inmate has been granted any early release under 3621(e).

As indicated in my prior declaration, on September 28, 2016, inmate Morrison reported to his Primary Treatment Specialist that he desired to withdraw from the treatment program. He signed the Notice of Change in RDAP and 3621(e) status form (BP-767) and was referred to the unit team for change in unit assignment.

Inmate Morrison expressed verbally and in writing that he wished to withdraw from the RDAP. Because he did not successfully complete the RDAP, he is no longer eligible to receive the benefit of the sentence reduction incentive.

Contrary to what he says . . ., inmate Morrison did not proceed to the "very last minutes of the RDAP". Also, as I stated in my prior declaration, inmate Morrison was not forced to redo the "majority of the program." Nor was he forced to withdraw due to his religious beliefs. In fact, it is Petitioner's continuing refusal to understand why he was not moving forward which is indicative of his issues within the RDAP as discussed in my prior declaration . . . .

Further, Psychology and RDAP staff do recognize it can be a challenging obligation for staff to determine whether inmates are successfully progressing. Staff must consider how much time to allow an inmate the opportunity to self-correct before stepping in as treatment staff to address the inmate's behavior. The treatment team must also keep in mind which inmates would benefit from additional treatment. Yet, it is precisely these staff members who are, by policy, tasked with the discretion to make these determinations.

In the instant case, it appeared that inmate Morrison was making progress in RDAP as he completed phases 1 and 2, and was moving toward the end of phase 3, but it was at that time that he exhibited pronounced behaviors which showed he had not met behavioral criteria for RDAP completion. Inmate Morrison's behavior indicated that he needed to receive additional treatment in a particular area before being considered to move forward.

It is inmate Morrison's refusal to accept the clinical assessment of his treatment team and DAP staff with which he disagreed that resulted in his subsequent voluntary decision to withdraw from the program.
Thus, the conclusion remains, per policy, inmate Morrison is no longer eligible for the early release consideration (up to 12 months following completion of all components of RDAP) pursuant to 3621(e) because of his totally voluntary decision to withdraw from the RDAP.

Doc. 29-1 at 2–5 (paragraph numbering, footnotes and citations to attachments omitted).

## III. EXHAUSTION

It is well established that a federal prisoner who seeks habeas corpus relief under 28 U.S.C. § 2241 "must [first] exhaust his available administrative remedies before he can obtain relief [from the court on his petition].").  *Davis v. Warden, FCC Coleman-USP*, 661 F. App'x 561, 562 (11th Cir. 2016), citing *Santiago-Lugo v. Warden*, 785 F.3d 467, 474–75 (11th Cir. 2015); *Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632, 634 (2nd Cir. 2001); *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir. 1994).   Although "the administrative-exhaustion requirement was judge-made, rather than jurisdictional . . . [t]he

[administrative] exhaustion requirement is still a requirement; it's just not a jurisdictional one." *Santiago-Lugo*, 785 F.3d at 474–75.

"In order to properly exhaust administrative remedies, a petitioner must comply with an agency's deadlines and procedural rules." *Davis*, 661 F. App'x at 562, citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006) (addressing the exhaustion requirements of the Prison Litigation Reform Act governing inmate civil rights actions). In *Woodford*, the Court determined that because proper exhaustion of administrative remedies is necessary an inmate cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him. 548 U.S. at 83–84. The Court reasoned that to hold otherwise would eviscerate the exhaustion requirement. *Id*. at 90–91; *see also Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA); *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Thus, when a federal inmate fails to fully and properly exhaust all of the administrative remedies provided by the BOP before filing his habeas petition, the petition is due to be denied for such failure. *See Davis*, 661 F.App'x at 562; *Santiago-Lugo*, 355 F.3d 1295.

The respondent submitted declarations by J. Latease Bailey, Consolidated Legal Center Leader/Supervisory Attorney for the Federal Bureau of Prisons, detailing the administrative remedies available to Morrison and his failure to properly exhaust these remedies.  In her initial declaration, Bailey provides the following information:

> The Administrative Remedy Program is described at 28 C.F.R. § 542.10, et seq., Administrative Remedy Procedures for Inmates.  In accordance with the administrative remedy procedures, inmates must first present their complaint to the Warden of the facility in which the inmate is confined, unless the inmate is appealing a decision of the Disciplinary Hearing Officer (DHO). Administrative Remedy Form BP-229(13) is the form to be utilized at the institution level, which is commonly referred to as a "BP-9" form. If the inmate is not satisfied with the Warden's response to the BP-9, the inmate may appeal to the Regional Director within 20 days of when the Warden signed the response. Administrative Remedy Form BP-230(13) is the form to be utilized at the regional level, which is commonly referred to as a "BP-10" form. If the inmate is not satisfied with the response of the Regional Director, that response may be appealed to the General Counsel's Office within 30 days of when the Regional Director signed the response. Appeal to BOP's Office of General Counsel is the final step in the BOP's administrative remedy process. Administrative Remedy Form BP-231(13) is the form to be utilized at the final level, which is commonly referred to as a "BP-11" form. The response from the General Counsel's Office is considered the final agency decision.
>
> If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level. 28 C.F.R. § 542.18.
>
> All remedies on the same subject matter will generally have the same unique numeric designation (e.g. "123456") as they proceed through the process from the institution to the Central Office level.
>
> Remedy requests are assigned a unique numeric designation, followed by a suffix indicating the level of the request, as follows: "-F" indicates a request to the Warden, "-R" indicates an appeal to the Regional Director, and "-A" indicates an appeal to the General Counsel's Office.

As a part of my duties, I have access to the computer records known as Sentry, which contain electronic records tracking the Administrative Remedy Program, prisoner remedy requests, and administrative responses at each appeal level.

The Sentry Administrative Remedy Log for inmate Morrison, reflects that many of the grounds raised in Inmate Morrison's petition were previously raised as an administrative remedy, and have not reached a final agency decision.  The grounds raised in the petition are listed below, along with the relevant unique numerical designation and the relevant appeal levels.

**A.   Ground 1**:  Petitioner claims "[t]he exercising of [his] civil rights [were] considered a drug addiction problem and stopping [him] from exercising [his] civil rights was the focus of [his] drug abuse treatment."

**Administrative Remedy #-876705-Fl and Rl**, alleging that the RDAP Coordinator tried to "chill" him from filing for administrative remedy which violated his First Amendment rights to grievance. This remedy was denied at both [F1 and R1] levels. Petitioner's appeal to the Office of the General Counsel was rejected because he included too many issues which were not related on one form. The Administrative Remedy Program Statement (1330.18), which is widely available to inmates, provides that "[t]he inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue." Petitioner was given 15 days to correct the defect. There is no record of Petitioner resubmitting this remedy· request.

**B.   Ground 2**:  Petitioner claims that he "was discriminated against for [his] religious belief by both inmates and staff."

**Administrative Remedy #-876698-Fl and Rl**, alleging staff and inmates are manipulating the RDAP to get rid of him due to his religion. This remedy was denied at both levels. Petitioner's appeal to the Office of the General Counsel was rejected because he included too many unrelated issues on the same form. Petitioner was given 15 days to correct the defect. There is no record of Petitioner resubmitting this remedy request.

**C.   Ground 3**:  Petitioner claims that he "was retaliated against for reporting a prison employee to their supervisor."

   **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**D. Ground 4**: Petitioner claims that he "was chilled[] during clinical team."

   **Administrative Remedy: Administrative Remedy #-876705-Fl and Rl.  Same as Ground 1 above**.

**E.   Ground 5**:  Petitioner claims that "[a]fter the formal warning ... [he] was the focus of multiple 'RDAP ATTACKS' by inmates at the behest of staff."

   **Administrative  Remedy**: Administrative Remedy 876703-Fl and Rl, alleging he was forced to take ownership of behaviors he did not commit. This remedy was denied at both levels. There is no record of an appeal to the Office of the General Counsel.

**F.     Ground 6**: Petitioner claims that he was given a surprise "clinical team" where Psychology staff attempted to force him to retract the administrative remedies he filed.

   **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**G. Ground 7**:  Petitioner claims that he was not given the ability to have a fair and impartial team for his formal warning.

   **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**H.   Groud 8**:    Petitioner claims he was forced to sign out of RDAP under duress.

   **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**I.     Ground 9**: Petitioner alleges the DAPC-AM retaliated against him for medical issues in the past.

   **Administrative  Remedy: Administrative  Remedy** 878149-Fl and Rl, requesting a review of his medical treatment. This remedy

was closed with an explanation at the facility level and denied at the regional level. Petitioner's appeal to the Office of the General Counsel was rejected because he included too many issues. Petitioner was given 15 days to correct the defect. There is no record of Petitioner resubmitting this remedy request.

**J.    Ground 10**: Petitioner alleges he was an excellent RDAP participant, not someone who needed a seven month roll back.

 **Administrative Remedy**:  Administrative Remedy 876706-Fl and Rl, alleging he received a wrongful formal warning and requesting that he be returned to a favorable transition member status. This remedy was denied at both levels. There is no record of an appeal to the Office of the General Counsel.

**K.  Ground 11**: Petitioner alleges two Drug Treatment Specialists violated their ethical obligations by using private counseling sessions to direct inmates to find reasons to "RDAP Attack" him in the program.

 **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**L.   Ground 12**:  Petitioner alleges the Warden has ignored any and all direct requests for succor (assistance or aid).

 **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

**M.    Ground 13**: Petitioner alleges the Warden and Psychology Chief have slowed the administrative remedy process and violated the guidelines of law and policy.

 **Administrative Remedy:  NONE**. This claim was not raised in any prior administrative remedy, and is therefore not properly before this court.

Thus, Petitioner has failed to exhaust the available administrative remedies for any and all issues he has raised in the instant petition and these issues are not properly before the court.

Doc. 20-3 at 2–7 (paragraph numbering and footnote omitted).

Ms. Bailey submitted a supplemental declaration addressing additional arguments presented by Morrison in a document filed on March 23, 2017, Doc. 25, regarding the exhaustion of remedies.  The relevant portion of Bailey's supplemental declaration states as follows:

> This supplemental declaration is to give additional information regarding the Administrative Remedy Program, 28 C.F.R. § 542.10, et seq. and BOP Program Statement (PS) 51330.18, Administrative Remedy Procedures for Inmates, which may be helpful in the determination of this suit filed by Petitioner Larry Morrison, reg. no. 43820-112.
>
> As stated in my previous declaration, all remedies on the same subject matter will generally have the same numeric designation (e.g. "123456") as they proceed through the process from the institution to the Central Office level. Remedy requests are assigned a unique numeric designation, followed by a suffix indicating the level of the request, as follows: "-F" indicates a request to the Warden, "-R" indicates an appeal to the Regional Director, and "-A" indicates an appeal to the General Counsel's Office.
>
> Sentry records show that since my original declaration, Petitioner has transferred to another institution, the Federal Correctional Institution (Low) in Petersburg, Virginia (FCI Petersburg (Low)). He arrived on February 1, 2017.
>
> Federal regulation and BOP policy provide that inmates have the responsibility to use the Administrative Remedy Program in good faith and in an honest and straightforward manner. **(§542.11 Responsibility b.)**
>
> Petitioner's *Document 25, Exhibit 4.1*, is a page from the program statement on the Administrative Remedy Program. This indicates that he is aware of the program and has access to the program statement to read and know specific requirements.
>
> The program statement states that an inmate may not raise in an Appeal issues not raised in the lower level filings. An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal. (**PS 1330.18, 9. Appeals, b. Form (2)**)

The federal regulation on the Administrative Remedy Program states that the Coordinator at any level may reject and return to the inmate without response a Request or Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of this part. (**28 CFR § 542.17, 11. Resubmission a. Rejections**) A later provision states that all submissions received by the Administrative Remedy Clerk, whether accepted or rejected, shall be entered into SENTRY in accordance with the SENTRY Administrative Remedy Technical Reference Manual. (**PS 1330.18, 13. Remedy Processing a. Receipt**.) This means the submission is given a remedy number and, if accepted, assigned for investigation. When a Request or Appeal is rejected (after receiving a number), the entire packet is returned to the inmate, unless the inmate has alleged the submission is sensitive. (**PS 1330.18, 11. Resubmission; b. Notice**.   **(1) Sensitive Submissions**)

Federal regulation further provides that when a submission is rejected, the inmate shall be provided a written notice, signed by the Administrative Remedy Coordinator, explaining the reason for rejection. If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal. (**28 CFR § 542.17, 11. Resubmission b. Notice**)

When the submission Response is sent out, one copy of the complete Request and response shall be maintained in the Warden's Administrative Remedy File together with all supporting material for accepted remedies. Three copies shall be returned to the inmate. For Regional Appeals, one copy of the Regional Appeal and response shall be retained at the regional office, one copy shall be sent to the Warden at the original filing location, and the remaining two copies shall be returned to the inmate. Finally, for Central Office Appeals, one copy of the Central Office Appeal and response will be returned to the inmate, one copy will be retained in the Central Office Administrative Remedy file, one copy will forwarded to the regional office where the Regional Appeal was answered, and one copy will be forwarded to the Warden's Administrative Remedy File at the original filing location. (**PS 1330.18, 13. Remedy Processing, f. Response Distribution**)

Regarding the *Request to Expedite and New Evidence Found* submitted by Petitioner, Sentry administrative remedy records show that since the date of the last remedies covered in my original declaration (12-22-2016), the BOP has recorded Petitioner as filing six more Appeals (two at the Central office

level and four at the regional level). (**Attachment A - Administrative Remedy Generalized Retrieval**)

As an initial matter, Petitioner filed the instant complaint on December 14, 2016. Sentry Administrative Remedy records show two of the Appeals attached as exhibits 2 and 3 by Petitioner to his Request to Expedite and New Evidence Found (Document 25), were only filed AFTER the instant complaint. Appeal 891200-A1 lists date received as 1-25-2017. Appeal 891200-A2 lists date received as 2-21-2017. There is/are no prior Submission(s) with this/these number(s) (891200) at the institution or regional level. Thus, these Appeals remedies were first filed after the petition at issue and should not be considered by the court.

Additionally, Petitioner seems to be asserting that he was only trying to follow Central Office instructions, but was being frustrated in his attempt by institution staff. This is not correct or supported by the documents.

Appeal number 891200-A1, was rejected on February 7, 2017. The rejection notice explained that Petitioner could not lump 9 different Appeals into the same Appeal. Petitioner was advised to appeal each appeal number separately and to seek help from his unit team to find the missing documents. The rejection form does not identify the documents missing in the Appeal.

Appeal number 891200-A2, was rejected on March 1, 2017, and Petitioner was directed to see his unit team for assistance in obtaining the requested documents. Again the missing documents were not identified in the Appeal rejection notice.

Petitioner has included the rejection notices for these Appeals as Exhibits to his Motion (**See Document 25, Exhibits 2  and 3**)  However, Petitioner has only submitted the rejection notices (or the cover page). Per policy for a non-sensitive submission, the entire packet was returned to Petitioner. (**28 CFR § 542.17, 11. Resubmission a. Rejections**) Yet, Petitioner has not submitted to the court the Appeal he sent to the BOP's Central Office. This is especially odd as Petitioner did submit as exhibits both the rejection notice and the Appeal for another rejected remedy in this same motion.

It is not clear exactly what documents Petitioner was directed to seek from his unit team. However, staff in the (Administrative Remedy section in the) BOP's Central Office know neither administrative remedy files or copies of

administrative remedies are maintained by unit team staff. Therefore, Central Office staff would not have directed Petitioner to get copies of his administrative remedies from his unit team.

The Administrative Remedy Program statement clearly states the Warden's office maintains copies of (accepted) administrative remedies for three (3) years. (**See para. 10 above; PS 1330.18, 13. Remedy Processing, g. File Maintenance; PS 1330.18, 15. Records Maintenance and Disposal, c. Administrative Remedy Case Files**.) Also, as the remarks on the rejection for Appeal 891200-A2, clearly state, Petitioner is to seek the assistance of his unit team in obtaining the records. He was not directed to get the records from them. Thus, it seems more likely that Petitioner asked his unit team for a document (or documents) different from what Central Office staff directed him to work with unit team to obtain. Thus, Central Office staff and Petitioner's Unit team were referring to different documents. Petitioner can easily refute this by submitting to the court the entire packet he submitted to Central Office for Appeals 891200-A1 and     -A2.

Petitioner has submitted the rejection notice and Appeal for Regional Appeal number 883269-R1 (**See Document 25, Exhibits 4.2 and 5**) Petitioner states "on or about 3-6-2017" he received a response for other administrative remedies sent regarding issues in this case. He further states "these were complaints that were ignored at the institutional level, to which Petitioner appealed pursuant to . .      ." and cited to BOP policy ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.").       (**See 28 CFR § 542.18; PS 1330.18, 12. Response Time**)

As an initial matter, Petitioner's statement that these remedies were "ignored at the institutional level is false. Petitioner lists *Exhibit 4.2 (to Document 25)* as the document to which he is referring. Exhibit 4.2 is a Rejection Notice for Regional Appeal 883269-R1. Sentry Administrative Remedy records show Remedy no. 883269-F1, was received at the institution on 11-04-2016, and rejected on 11-21-2016. The rejection sheet states the reason for rejection as Petitioner was appealing more than one issue. Petitioner was directed to correct the defect and resubmit within 5 days. Sentry has no record of Petitioner refiling this remedy at the institution level. Thus, the institution did not "ignore" the remedy, as Petitioner alleges, it rejected his remedy. Further, according to policy, the Unit Manager is responsible for ensuring that inmate notices (receipts, extension notices, etc.) are printed and delivered to the inmate (**PS1330.18, 5. Responsibility (8)**). Petitioner would

have received the notice of rejection of remedy 883269-F1, from his unit team.

Additionally, Petitioner incorrectly states the reason for the rejection of Appeal 883269-R1, contrary to Petitioner's assertion "the response was that Petitioner did not provide a copy of his institutional administrative remedy request or a copy of the response from the Warden," the "Remarks" section of the Rejection Notice states "need a clear copy of the BP-9." This does not say that Petitioner did not provide a copy of the BP-9. It says the copy he provided was not clear. Petitioner only had to submit a clear copy of the BP-9, with the Appeal to have the remedy accepted.

Even if Petitioner is correct that he was appealing the institution's "ignoring" of his issues, he has still not used the administrative remedy process correctly. The federal regulation on administrative remedies provides that when a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection ... to the next appeal level. The Coordinator at that level may affirm the rejection, may direct that the submission be accepted at the lower level (either upon the inmate's resubmission or direct return to that lower level), or may accept the submission for filing. The inmate shall be informed of the decision by delivery of either a receipt or rejection notice. (**28 CFR § 542.17, 11. Resubmission c. Appeal of Rejections**)

If Petitioner is appealing a denial or rejection, the regional office is not the last stop. If he was not given the opportunity to correct the defect at the regional level, he should appeal the rejection to the Central Office level. The Coordinator at the Central Office level can affirm the rejection, direct that the submission be accepted at the lower level, or accept the submission for filing. The Petitioner will be informed of the decision of the Coordinator by either a receipt or rejection notice. (**See PS 1330.18, 11. Resubmission. c. Appeal of Rejections**)

Petitioner has never completed any Submission or Appeal of an issue regarding the RDAP program throughout the administrative remedy process. Contrary to Petitioner's statement in his Motion that "(t)his is further, exhaustive, evidence of the Hide-and-Seek tactics of Respondent in order to avoid allowing Petitioner to pursue his Administrative Remedy rights," this is proof that Petitioner has not tried to use the Administrative Remedy Program in good faith. He has attached a copy of a page of the (old) administrative remedy policy (**See** *Document 25, Exhibit 4.1*), yet Petitioner refuses to follow the policy on the page he attached. Petitioner has refused to

resolve the defects in his numerous rejected remedies, even after being told specifically what they were. Hence, it is Petitioner who has exercised "Hide-and Seek tactics in order to avoid" properly using the Administrative Remedy Program.

Thus, the conclusion of my original declaration remains, Petitioner has not exhausted the available administrative remedies and his petition should be dismissed.

Doc. 29-2 at 2–8.

In the instant case, Morrison asserts "that he did everything that could be reasonably expected of him to exhaust his administrative remedies [as to claims 1, 2, 4, 5, 9 and 10], but -- after numerous rejections at the Central Office (National) level based on errors not precipitated by Petitioner – the final stage of appeals would not enter the administrative remedies on his behalf to address his concerns." Doc. 40 at 4. Generally, Morrison argues that the appeals were therefore not available to him because prison officials prevented him from completing the final stage of his administrative remedies. Doc. 40 at 4.

The respondent has set forth a detailed description of the actions taken by Morrison to appeal some of the claims presented to this court. With respect to the claims raised in the administrative process, the respondent argues that Morrison failed to properly raise each claim throughout the administrative process and did not correct the deficiencies in his appeal to the General Counsel's Office after being advised to resubmit the rejected appeal with the proper documents. The court notes 28 C.F.R. § 542.14(b) provides a mechanism by which an inmate may "demonstrate . . . a valid reason for delay" and may seek an extension of time for filing his appeal. Morrison does not assert that he made any attempt to seek an extension of time for filing an appeal to the General Counsel to discover the

necessary forms, or that he otherwise sought to fully complete the administrative process before initiating this petition, as required.  *See Higginbottom*, 223 F.3d at 1261.  In addition, the Supreme Court has determined that futility of exhaustion is no excuse for lack of exhaustion as it "will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."  *Booth v. Churner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Wells v. Rathman*, 2014 WL 6455142, at *2–4 (N.D. Ala. Nov. 13, 2014).  Morrison has therefore failed to demonstrate the presence of any exception which excuses his failure to exhaust his administrative remedies.

Upon thorough review of the record in this case, the court finds that Morrison failed to properly exhaust the three-level administrative remedy established by the BOP regarding the claims presented in his habeas petition.  Thus, Morrison has not satisfied the requirement that he exhaust his available remedies before seeking habeas corpus relief in this court. Morrison has likewise failed to establish circumstances justifying waiver of the exhaustion requirement.  In addition, it is undisputed that Morrison did not complete RDAP.  Absent completion of RDAP, Morrison is not eligible for the sentence reduction sought in this petition.  Consequently, the court finds that Morrison's 28 U.S.C. § 2241 petition for habeas corpus relief due to be denied.[3]

---

[3]The court notes that even had Morrison properly exhausted his administrative remedies he would be entitled to no relief as prison personnel provided valid reasons for the actions taken against Morrison during his participation in RDAP.  Specifically, the challenged actions transpired due to Morrison's failure to adequately progress through each phase of RDAP — i.e., (i) "a pattern of limited progress, low commitment toward integrating and practicing prosocial values, and poor treatment compliance[,]" (ii) his admission "that 'when he does not get his way' . . . his desired way to retaliate is to file administrative remedy claims against" staff members, (iii) lack of adequate anger management, (iv) his struggle to "employ[] healthy coping mechanisms and skills," (v) continual "manipulation as his primary method of coping with events

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the undersigned Magistrate Judge that:

1.  The 28 U.S.C. § 2241 petition for habeas corpus relief filed by Larry Morrison be DENIED; and

2. This case be DISMISSED.

It is further ORDERED that on or before **October 25, 2018** the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

---

or actions he does not like[,]" (vi) a repeated pattern of unhealthy and disruptive behaviors, (vii) the use of "homophobic slurs" towards his community peers, (viii) refusal to accept responsibility for his recalcitrant behavior, (ix) refusal to follow orders of the treatment team, (x) lack of receptiveness to feedback from his peers, and (xi) "insufficient change regarding treatment goals[.]"  Doc. 20-4 at 4–7.

DONE this 11th day of October, 2018.


                           /s/ Wallace Capel, Jr.
                       CHIEF UNITED STATES MAGISTRATE JUDGE